OPINION OF THE COURT
Arthur D. Spatt, J.
Plaintiff claims that he has been rendered sterile by the malpractice of the defendants. Defendants seek to compel plaintiff to undergo a “semen test”. Must plaintiff accede to such a request, even though such compliance would cause plaintiff to undergo an alleged emotional, embarrassing and humiliating experience? For the reasons set forth below, the court finds that the plaintiff must undergo the “semen test”, as requested.
This is a motion for an order, pursuant to CPLR 3124 and 3121, compelling plaintiff to submit to a physical examination and to specific tests, including a “semen test”, at the office of Dr. Richard D. Amelar.
BACKGROUND AND CONTENTIONS
In this action, plaintiff claims that as a result of a negligently performed hernia operation, he has been rendered sterile.
*159 Following plaintiff’s service of a notice of availability for a physical examination dated October 1, 1980, the attorneys for defendant Koopersmith requested several extensions of the examination date so that medical records could be obtained. Defendant Koopersmith has selected Dr. Richard D. Amelar to conduct the medical examination of the plaintiff. Dr. Amelar is a urologist whose specialty has been limited “for many years to the field of male infertility”.
The court presumes, in the absence of any statement to the contrary that no statement of readiness has been filed.
In an affidavit in support of this motion, Dr. Amelar explains the nature of the tests that are required to ascertain whether plaintiff is, in fact, sterile, as follows:
“I have been asked by the firm of furey, furey, gerver & mchenry to assist them in this lawsuit by informing them whether or not the plaintiff, Mr. Alan Adlerstein, is sterile and/or impotent, as he claims. Further, if the man is sexually impaired, to what extent and whether acquired or congenital, and if acquired, how. In order to do so, four investigative modalities must be employed:
“1. Physical examination
“2. History
“3. Semen analysis
“4. Blood studies
“The Court should note that all of these modalities are non-in vasive.”
In particular, with regard to a semen analysis, Dr. Amelar states: “A semen analysis is of great importance in evaluating sterility or impotence. Semen analysis includes a sperm count, which will reveal the presence or absence of sperm in the ejaculate, and the number of sperm per unit volume (millileter). If sperm are present, their motility (ability to move) over a period of time is analyzed. The morphology of the sperm cells, that is their composition and structure, is also studied. In addition to the sperm studies, the volume and viscosity of the ejaculate is studied, and a fructose level is taken. All. of these studies are performed on one semen sample from the patient, usually *160 collected at a laboratory by the patient himself. I have a laboratory with facilities adequate to perform these studies at my office, so that the entire procedure can be performed at one time.”
Dr. Amelar asserts that “a full and complete evaluation of the man’s claim of sterility and impotence *** can not be made without the performance of all four of the investigative modalities *** If any one of the four modalities listed is omitted, the conclusions *** will not be complete and may not be an accurate analysis of the source and extent of this man’s problems.” Dr. Amelar states that these procedures are noninvasive with the exception of a needle prick in the arm to draw a blood sample.
Counsel for the codefendant South Nassau Communities Hospital (Hospital) have agreed to participate in the physical examination to be performed by Dr. Amelar, so that there will be only one such examination performed on behalf of both defendants.
Plaintiff’s counsel vigorously objects to both the physical examination by Dr. Amelar and to the special testing. Said counsel points out that a notice for physical examination was served upon the attorneys for the defendant Koopersmith on October 1, 1980 for a physical examination on November 5, 1980. Requests for an extension of time by defendant Koopersmith were granted until December 29, 1980, and not thereafter. Plaintiff asserts that the failure to conduct the physical within the applicable period of time, as extended, constitutes a waiver by defendant of his right to a physical examination.
Further, plaintiff objects to a four-page form annexed to the motion papers entitled “urological history” upon which Dr. Amelar intends to question the plaintiff, upon the ground that plaintiff has already provided a full medical history in his oral deposition.
With respect to the semen analysis, “plaintiff does not deny that this test is of value in determining whether, in fact, the plaintiff is sterile”. However, plaintiff objects to this additional semen test upon the following grounds: (1) plaintiff has undergone two previous semen analyses, which results have been provided to the defendant; (2) the *161 manner in which a semen analysis is taken “is an extremely emotionally uncomfortable, embarrassing and humiliating experience” which will “unduly invade the privacy of the plaintiff”; and (3) the tests and surgery which were performed upon the plaintiff are conclusive, and the tests sought by Dr. Amelar would be unnecessarily repetitive.
THE LAW
Although there is authority for the waiver of a physical examination by failure to take advantage of a “notice of availability” (Delgado v Fogle, 32 AD2d 85), the particular facts in this case do not call for such a drastic curtailment of this substantial right. The attorneys for the defendant Koopersmith did not ignore the “Notice” nor did they willfully abandon their right to conduct a physical examination. It was essential for them to obtain the relevant medical records prior to the examination, so that their appropriate requests for extensions of time should have been granted. In addition, the period of time between the last extension granted, December 29,1980, and the date of this notice of motion, February 10, 1981, is relatively short. (Compare Crespo v Thomas, 73 AD2d 898.) Movants did not delay this situation; they acted promptly and their motion papers are supported by competent medical proof which establishes the necessity of the physical examination and the requested tests.
Even in cases where a statement of readiness has been filed, the courts have permitted a physical examination where a reasonable excuse has been offered. (See Marks v Stevensville Country Club, 58 AD2d 644; Robinson v Morphis, 57 AD2d 920; De Fino v City of New York, 99 Misc 2d 594.)
Here there has been a reasonable excuse offered as to the reason for the short delay involved, and, in this court’s view, denial of the right of defendant Koopersmith to a physical examination with regard to this serious claim would be an abuse of discretion.
On the merits, by bringing a personal injury action, a plaintiff puts his physical condition in controversy and must submit to examination, incidentally waiving the *162 doctor-patient privilege which otherwise insulates these matters. (Koump v Smith, 25 NY2d 287; Chester v Zima, 41 Misc 2d 676; Siegel, New York Practice, § 363.)
The relevant statute governing such physical examination is CPLR 3121 (subd [a]) which reads, in pertinent part, as follows: “After commencement of an action in which the mental or physical condition or the blood relationship of a party * * * is in controversy, any party may serve notice on another party to submit to a physical, mental or blood examination by a designated physician”.
. The general underlying principle with regard to permitting a physical examination in a personal injury case is to “attempt to narrow down the areas of medical dispute, and the aim is, ultimately, with the assistance of the medical profession, to eliminate most of the controversy on the medical side of personal injury cases.” (Del Ra v Vaughan, 2 AD2d 156, 157; Milam v Mitchell, 51 Misc 2d 948.)
As to defendants’ request for a blood test, it is clear that the taking of “a few drops of the plaintiff’s blood [for examination] so that the examining physician, by an analysis of it, may be aided *** to give an opinion as an expert upon the trial” under certain conditions and safeguards, is permissible. (Hayt v Brewster, Gordon & Co., 199 App Div 68, 70.)
In the absence of a claim that the plaintiff is in such a condition of health that a blood test would be injurious to him, the defendants shall be permitted to obtain plaintiff’s blood for testing. However, the supply of blood may be taken by a physician selected by the plaintiff, if he so desires.
As to the more difficult question of the semen test, the court has been unable to find any authority directly in point, and a review of the standards and criteria established by the courts in this field is in order.
In early cases, the courts were reluctant to permit any kind of tests which were painful or even unusual. For example, at one time, it was held that a party could not be compelled to submit to the taking of X rays. (Van Orden v Madow, 207 App Div 827.) Now, of course, the taking of X rays of a plaintiff is freely and regularly permitted. (Fein *163 berg v Fairmont Holding Corp., 272 App Div 101; 3A Weinstein-Korn-Miller, NY Civ Prac, par 3121.06.)
While a plaintiff was directed to submit to the taking of X rays, he was not required to submit to a myelogram, since it was a physical invasion of his body. (Goldman v Linkoff, 45 AD2d 709.)
In a case involving a claim of respiratory disease, the court refused to allow a defendant to perform a “breathing test” on the ground that the record was not clear that such test could be made with safety to the plaintiff. (Grill v Mathieson Alkali Works, 243 App Div 853.)
In Bartolotta v Delco Appliance Corp. (254 App Div 809), the court found no abuse of discretion to refuse to require the plaintiff to submit to the taking of a barium meal to assist in taking an X ray of plaintiff’s stomach.
In Carrig v Oakes (259 App Div 138, mot for lv to app den 259 App Div 798), the court denied to the defendants the right to conduct a cystoscopic examination of the plaintiff where the affidavits of the medical experts conflicted on whether such examination was a painful and sometimes fatal major operation.
In Carpinelli v Manhattan Bottling Corp. (21 AD2d 792), Special Term refused to permit a psychogalvanic skin reaction test, upon the ground that the instrument utilized in the skin reaction tests had not yet received general scientific acceptance as would justify the admission of the results in evidence. Held, that under controlled conditions such test was of “some value”, was harmless and involved neither pain nor discomfort. (See, also, Habersham v Grimaldi, 18 AD2d 615, in which the same skin test was permitted where there was no indication that it would “unduly burden the plaintiff or subject him to any danger” but would be “safe, without discomfort or pain, and of relatively short duration”.)
There are exceptions, even to the “physical invasion” rule as seen in Cardinal v University of Rochester (188 Misc 823, affd as mod 271 App Div 1048, followed at Special Term at 71 NYS2d 617), in which X rays, a sample of urine for analysis, removal of food contents of the stomach to permit gastric analysis, and, finally, after appeal, a bone *164 marrow biopsy by puncture, were permitted. The court found that “practically no pain” results from a bone marrow biopsy.
While there is no requirement that the results of the test be decisive or invulnerable (Carpinelli v Manhattan Bottling Corp., supra), in this case, the defendants’ physician states, without refutation, that the semen test is a decisive one.
Defendants’ request for the semen test is within the standards and criteria established by the precedents. Such a test is not a physical invasion of plaintiff’s body; does not involve any danger to plaintiff; is not painful; and is a decisive test in the medical investigation of whether plaintiff, is in fact, sterile. (See Linden v Shore, 49 AD2d 865.)
The defendants do not have to rely upon the prior semen tests conducted by plaintiff’s physicians. They are entitled to their own test by a physician of their choosing, for the purpose of confirmation, refutation and/or testimony at the trial. While it is true that the manner in which a semen analysis is taken may be embarrassing and may even- be humiliating, the defendants cannot be precluded from such an objective and decisive test in the face of this serious claim, which is allegedly permanent in nature. (See Gonzalez v Ormont Mach. Corp., 78 AD2d 633.) At the trial, plaintiff will be compelled to testify in public, at length, and perhaps in detail, as to the nature of this claim of sterility. It is plaintiff’s absolute right to advance this claim; it is no less defendants’ right to ascertain its validity by way of this objective, decisive and painless test.
As to the four-page history form entitled “urological history”, the court does not deem it necessary to examine or review the various items and questions contained therein in detail. In this personal injury case, the defendants’ examining physician is permittéd to inquire into (1) the nature and extent of the injuries and/or conditions plaintiff sustained as a result of this occurrence, and (2) the plaintiff’s prior medical history both as to physical and mental injuries and conditions. (See Young v Kennedy, 106 NYS2d 274.)
Accordingly, this motion by defendant Koopersmith to compel plaintiff to submit to a physical examination and to *165 take specific tests including a blood test and a “semen test”, is granted, upon the following conditions:
1. There will be one such examination and testing performed by Dr. Richard D. Amelar on behalf of both defendants.
2. As to the blood test, the supply of blood may be taken by a physician selected by plaintiff, if he so desires.
3. The semen test will be conducted at the office of Dr. Amelar affording the plaintiff complete personal privacy.
4. The examination and testing shall take place at the date and time set forth in the final order herein, or, if a date cannot be agreed upon, at a date to be fixed by the court.